IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

PRISCILLA JONES,                    *
                                    *
        Plaintiff,                  *
                                    *
vs.                                 *    CIVIL ACTION NO. 05-00497-CG-B
                                    *
LINDA S. McMAHON,[1]                *
Commissioner of                     *
Social Security,                    *
                                    *
        Defendant.                  *

## REPORT AND RECOMMENDATION

Plaintiff Priscilla Jones ("Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 et seq. and 1381 et seq. The parties waived oral argument on February 6, 2007. (Doc. 17). Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **RECOMMENDED** that the decision of the Commissioner is due to be **AFFIRMED**.

## I.  Procedural History

Plaintiff protectively filed an application for disability insurance benefits and supplemental security income on June 16, 2003. (Tr. 12, 76-78, 84, 188-192). She alleged that she has been disabled since May 8,

_____

[1]On January 20, 2007, Linda S. McMahon became the Acting Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Linda S. McMahon has been substituted, therefore, for Commissioner Jo Anne B. Barnhart as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2003, due to diabetes, bullets in her legs, foot swelling and numbness, and poor vision.  (Id.)  Plaintiff's application was denied initially and upon reconsideration.  (Id. at 55-61, 191-197).  Plaintiff filed a timely Request for Hearing before an Administrative Law Judge ("ALJ").  (Id. at 62).  On January 31, 2005, Administrative Law Judge Frances P. Kuperman ("ALJ Kuperman") held an administrative hearing which was attended by Plaintiff, her representative and a vocational expert.  (Id. at 26-54). On May 25, 2005, ALJ Kuperman entered an unfavorable decision wherein he concluded that Plaintiff is not disabled because she retains the residual functional capacity ("RFC") to perform light and sedentary work, and can perform her past relevant work ("PRW").  (Id. at 8-24).  Plaintiff's request for review was denied by the Appeals Council ("AC") on August 2, 2005, thereby making the ALJ's decision the final decision of the Commissioner under 20 C.F.R. § 404.981.  (Tr. 4-6).  The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

**II.   Issues On Appeal**

A.   Whether the ALJ erred in failing to obtain a residual functional capacity assessment from a treating or examining physician in determining Plaintiff's residual functional capacity, and by failing to include all of her severe impairments in his determination?

B.   Whether the ALJ erred by failing to include all of Plaintiff's severe impairments in the hypothetical posed to the vocational expert?

C.   Whether the ALJ erred by failing to consider the impact of her obesity?

D.   Whether the ALJ erred by finding that Plaintiff does not meet Listing 12.05C?

**III.  Factual Background**

Plaintiff was born on February 22, 1951, and was 53 years old at the

time of the hearing.  (Tr. 76).  She has a 10th grade education and last worked as a cashier.  (Id. at 29, 87-89, 100, 105).  According to Plaintiff, she was laid off in 2003, and received unemployment benefits for one year.  (Id. at 36-37, 44-48).  At the January 31, 2005 administrative hearing, Plaintiff testified that she is 5'11" and currently weighs 260 pounds.  (Id. at 29-30, 40).  Plaintiff testified that 10 years ago, she weighed 170 pounds.  (Id.)  She testified that she can no longer walk or stand like she used to, due to her weight.  (Id. at 40).  She testified that she has diabetes for which she takes insulin everyday.  (Tr. 31, 33-34, 41-44).  Plaintiff testified that her diabetes causes numbness in her feet and hands and makes it difficult for her to work because she cannot sit or stand for long periods of time, and the toes on her left foot go numb.  (Id.)  Plaintiff also testified that she was shot in her left leg in 1985, that she had to learn to walk again and is now unable to stand for long periods of time.  (Id. at 34-35, 38-39).  Plaintiff testified further, that she has trouble sleeping, and that she has been depressed a lot but has not seen anyone about it due to a lack of money and insurance.  (Id. at 33, 41-42).  Regarding daily activities, Plaintiff testified that her daughter performs her household chores, such as sweeping and cooking, for her, but she sometimes goes to the store to shop.  (Id. at 33-34).  According to Plaintiff, she spends most days sitting or laying down watching television.  (Id. at 32, 35).  Plaintiff testified that she cannot return to her past work because she cannot "handle" her hands, see well or concentrate.  (Tr. 38).  She also noted problems standing due to feet and leg pain, as well as an inability to lift.  (Id. at 38-39).  Plaintiff testified that she takes Motrin, which helps "[a] little bit."  (Id. at 43-44).  Her other reported

3

medications have included Novolin, Insulin, Tylenol Arthritis, Advil, Benadryl, Glucotrol and HCTZ.  (Id. at 113, 117, 118, 122-123).

**IV.   Analysis**

**A.   Standard of Review**

In reviewing claims brought under the Act, this Court's role is a limited one.  The Court's review is limited to determining: 1) whether the decision of the Secretary is supported by substantial evidence; and 2) whether the correct legal standards were applied.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).[2]  A court  may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding that substantial evidence is defined as "more than a scintilla but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]").  In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision.  Chester v. Bowen, 792 F. 2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. Dist. Lexis 10163 (S.D. Ala. 1999).

**B.   Discussion**

An individual who applies for Social Security disability benefits must prove her disability.  20 C.F.R. §§ 404.1512, 416.912.  Disability

---

[2]This Court's review of the Commissioner's application of legal principles is plenary.  Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 404.1505(a), 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven her disability. 20 C.F.R. §§ 404.1520, 416.920.[3]

In case sub judice, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since her alleged onset date. (Tr. 11-24). The ALJ concluded that while Plaintiff has the severe impairments of insulin dependent diabetes mellitus ("IDDM"), obesity, tendinitis/bursitis of the shoulders and mild arthritis of the left foot, and the nonsevere impairment of depression, these impairments do not meet or medically equal the criteria for any of the impairments listed in 20

---

[3]The claimant must first prove that he or she has not engaged in substantial gainful activity. The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history. Id. at 1005. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler, 764 F.2d 834 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

C.F.R. Pt. 404, Subpt. P, App. 1, Regulations No. 4.  (<u>Id</u>.)  The ALJ found Plaintiff's allegations of pain and functional limitations not fully credible and adopted Dr. Nayeem's functional assessment as her residual functional capacity ("RFC"), to then conclude that she retains the RFC to perform a range of light and sedentary work and is able to perform her past relevant work ("PRW") as a cashier, such that she is not disabled.  (<u>Id</u>.)

The undersigned finds that substantial evidence of record supports the ALJ's decision.  Relevant[4] evidence reveals that Plaintiff was treated for obesity and diabetes mellitus ("DM") by Arlene Moskovich, M.D. ("Dr. Moskovich"), as follows (Tr. 119-124):

- <u>June 18, 1996</u>: Treatment notes reflect that Plaintiff had been shot in her left leg in 1987 and that her left foot swells and is painful when she works and stands on it.  Upon exam, she had left foot tenderness and edema. She was assessed with edema, probably secondary to the old injury.  She was advised to elevate her leg and was given HCTZ.

- <u>September 24, 1997</u>: Treatment notes reflect that Plaintiff complained of feeling dizzy.  She was assessed with diabetes poor control and obesity.  She was prescribed a 1,500 calorie ADA diet, Glucotrol, Diabetic teaching and was advised to return in 2 weeks.

- <u>October 8, 1997</u>: Treatment notes reflect that Plaintiff appeared for a follow-up visit for diabetes.  RBS 144.

- <u>March 11, 1998</u>: Treatment notes reflect that Plaintiff appeared for a follow-up for diabetes and indicated that she needed a prescription.  RBS was noted.  She was assessed with diabetes, hyperlipidemia and obesity.  She was advised to follow a 1,500 calorie low fat diet and was placed back on Glucotrol.

- <u>June 16, 1998</u>: Treatment notes reflect that Plaintiff

---

[4]While other records relating to Plaintiff's treatment have been reviewed, only those records relating specifically to her claims on appeal will be discussed herein.

6

appeared for a follow-up exam for diabetes.  She was assessed with diabetes and her Glucotrol was increased.

Plaintiff was treated at the Vaughan Regional Medical Center in July 1999.  (Id. at 148-152).  Treatment records reveal that Plaintiff was "somewhat obese" at 268 pounds, and that she was being treated with Glucotrol to control her blood sugar levels.  (Id.)  Plaintiff was treated by Frank Dozier, M.D. ("Dr. Dozier") of the Family Medical Center as follows (Id. at 143-147, 160-163, 177-178, 185-187):

- March 10, 1999: Treatment notes reflect that Plaintiff was out of her diabetes medication.  She indicated that she felt well, but it was noted that her blood sugar level was slightly elevated.

- November 18, 1999: Treatment notes reflect that Plaintiff's blood sugar level was 228 and that she weighed 266½ pounds.  She was assessed with uncontrolled DM, her insulin was increased and it was recommended that she use a Glucometer at home.

- September 18, 2000: Treatment notes reflect that Plaintiff presented for a blood sugar level check.  It was noted that she was using her Glucometer infrequently.  Her exam revealed that she weighed 286 pounds and that her blood sugar level was 288.  She was assessed with uncontrolled DM and her insulin was increased.

- October 3, 2000: Treatment notes reflect that Plaintiff weighed 271 pounds and that her blood sugar level was 262.  Her diabetes was not controlled.  It was recommended that she start walking and her insulin was increased.

- June 6, 2001: Treatment notes reflect that Plaintiff weighed 266 pounds and reported that her feet hurt.

- June 11, 2001: Treatment notes reflect that Plaintiff reported that her feet hurt and that she felt badly.  Her exam revealed that she was in no acute distress.  She weighed 268 pounds and her blood sugar level was 223.  She had good peripheral perfusion and pulses and had minimal edema.  She was noncompliant, and was assessed with Type II diabetes, non-compliant diabetic neuropathy.  She was advised to continue on Humulin and to add Glucophage.

- <u>November 27, 2001</u>: Treatment notes reflect that Plaintiff complained of pain in her left shoulder. She reported that she had been out of Glucophage for a "good while" and that her blood sugar levels had been good when taking her medication. Her exam revealed mild crepitus of the left paraspinal area in the left scapula area and a blood sugar level of 289. She weighed 261 pounds. She was assessed with probable bursitis and uncontrolled diabetes mellitus. It was recommended that Plaintiff check her blood sugar routinely.

- <u>February 8, 2002</u>: Treatment notes reflect that Plaintiff reported that her blood sugar levels had been 231 at home and were fluctuating. She weighed 261 pounds. It was noted that she was becoming dependent on Insulin, so she could discontinue Glucophage, as it "doesn't seem to have made any difference."

- <u>October 29, 2002</u>: Treatment notes reflect that Plaintiff reported pain in her right arm and shoulder over the last four days. Her exam revealed that she was neurologically intact with good distal pulses and shoulder tenderness with no swelling. Her x-rays were negative. She was assessed with probable inflammation of the right shoulder and prescribed medication for discomfort and given Ultram for ulcers.

- <u>March 21, 2003</u>: Treatment notes reflect that Plaintiff weighed 263 pounds and that her insulin was increased.

- <u>October 21, 2003</u>: Treatment notes reflect that Plaintiff complained of mild tenderness of the right arm and that her blood sugar level was in the 200s. She was assessed with uncontrolled diabetes and probable tendinitis of the right shoulder and arm. Her Humulin dosage was changed, and she was advised to take Aleve for the tendinitis.

- <u>October 28, 2003</u>: Treatment notes reflect that Plaintiff's lab results were discussed with her. She was also advised regarding exercise and diet. Her insulin was increased.

- <u>July 14, 2004</u>: Treatment notes reflect that Plaintiff's diabetes was in "fair control," and that she weighed 264 pounds.

On August 15, 2003, Plaintiff presented to Mohammed A. Nayeem, M.D. ("Dr. Nayeem") for a consultative exam. (Tr. 164-167). Upon examination: 1) her upper extremities showed normal peripheral pulses,

normal skin with no vascular changes, normal muscle tone with no wasting, intact sensation to pain, touch and temperature, normal and symmetric deep tendon reflexes, normal muscle coordination, normal joint inspection and normal range of motion of the shoulders, elbows, wrists and fingers; 2) her lower extremities showed normal muscle strength with no wasting, intact sensations for pain, touch and temperature, normal and symmetric deep tendon reflexes, normal vibration and joint sense, normal muscle coordination, normal peripheral pulses, no edema, varicose veins or vascular changes, and normal range of motion of hips, knees and ankles; and 3) her spinal exam revealed no tenderness, no scoliosis, normal musculature, full range of motion, and negative straight leg raising at 80 degrees. (Id.)  She had no arthritis, no breathing problems, no chest pain or shortness of breath, and a normal appetite. (Id. at 165).  Her mental state was normal, she was oriented to time and space, and she had an intact memory. (Id.)  She could not perform the heel to toe walk due to extreme obesity and could not squat more than half of the way down due to obesity; however, she could dress herself, climb on and off of the exam table, and had a normal gait. (Id. at 167).  Plaintiff's L-spine X-rays revealed degenerative disc disease ("DDD") with degenerative joint disease ("DJD") of the lower lumbar spine, and left foot x-rays revealed mild degenerative disease of the tarsal joints of the left foot. (Id.)

Dr. Nayeem diagnosed Plaintiff with gross obesity exogenous; adult onset IDDM under poor control, possibly due to excessive eating and no diet program; DJD and DDD of the lower back, asymptomatic at the present time, noting that she has normal back movements and walks with normal gait; and DJD of the left foot with episodes of occasional pain, noting that she walks with normal gait. (Tr. 167).  Dr. Nayeem concluded that

Plaintiff needed to lose some weight, and that weight loss would get her diabetes under good control and prevent her arthritis from getting worse. (Id.)  He opined that she could not perform strenuous physical activity or heavy manual labor due to extreme obesity, but that she could take part in mild to moderate activities.  (Id.)  He further opined that with proper amount of weight loss, Plaintiff could be fully functional.  (Id.)

On September 12, 2003, a State Agency medical consultant (Identified by Code number "19")[5] completed a Residual Physical Functional Capacity Assessment, noting Plaintiff's diagnoses of exogenous obesity, diabetes and DJD in the lower back and left foot (per Dr. Nayeem's findings). (Id. at 168-175).   The consultant concluded that Plaintiff can occasionally lift/carry up to 50 pounds; frequently lift/carry up to 25 pounds; stand/walk/sit for 6 hours per 8 hour workday; has unlimited push/pull abilities; frequently climb ramps, stairs, ladders, ropes and scaffolds, as well as balance, stoop and crawl; occasionally kneel and crouch; and has no manipulative, visual, communicative or environmental limitations.  (Id.)

On April 29, 2004, Donald W. Blanton, Ph.D. ("Dr. Blanton") performed a psychological evaluation.  (Tr. 179-182).  Dr. Blanton found that Plaintiff was "a simple, open woman whose mental retardation was obvious[]."  (Id. at 180).  Her mental examination revealed that she had normal thoughts and conversation; intact associations; a flat but appropriate and labile affect; no confusion; a depressed mood; poor sleep; a fair appetite; stable weight with low energy; no psychomotor retardation or agitation; no suicidal ideation; limited insight; no

---

[5]Plaintiff infers that the individual who completed this evaluation is not a physician as the signature is illegible and does not indicate a medical degree.

evidence of hallucinations, delusions or persecutory type fears; no phobias or obsessive compulsive traits; she was alert; her intelligence was "below[;]" and her judgment was fair for work and financial type decisions. (<u>Id</u>. at 179-182). WAIS-III test scores revealed a verbal IQ 69, performance IQ 69 and full scale IQ 66, placing her in the mild range of mental retardation. (<u>Id</u>. at 181). WRAT-III testing revealed that she received a reading score of 70, spelling score of 72 and arithmetic score of 75 (5th grade level). (<u>Id</u>.) MMPI testing was attempted but the results were "invalidated" by "a combination of poor intellect and poor reading ability." (<u>Id</u>.) Beck Depression Inventory II testing placed Plaintiff in the moderately depressed range. (Tr. 181). In conclusion, Dr. Blanton assessed Plaintiff with anxiety and a moderate level of depression since the onset of her diabetes and chronic pain (Axis I); mild mental retardation (Axis II); leg pain, diabetes and obesity (Axis III); financial problems (Axis IV); and a GAF of 50 (Axis V). (<u>Id</u>. at 182).

Also on this date, Dr. Blanton completed a Mental Medical Source Opinion Form, in which he concluded that Plaintiff has mild limitations in her abilities to maintain activities of daily living, understand, remember and carry out simple instructions, respond appropriately to supervision and co-workers, deal with changes in a routine work setting, respond appropriately to customers or other members of the general public, and use judgment in simple one or two step work-related decisions; and marked limitations in her abilities to understand, remember and carry out detailed or complex instructions, respond to customary work pressures, use judgment in detailed or complex work-related decisions, and maintain attention, concentration or pace for

periods of at least two hours. (Id. at 183). It was also noted that she had a mild degree of deterioration in personal habits and a mild degree of constriction of interests. (Id. at 184). Dr. Blanton opined that these limitations would last for 12 months or longer and have existed at their severity levels for 1 year; that her pain allegations are consistent with clinical findings; that her condition is likely to deteriorate if placed under stress, especially that of a job; and that "[r]ehabilitation will be very difficult due to the combination of MR, poor academic skills, physical and emotional problems." (Id.)

**A.**   **Whether the ALJ erred in failing to obtain a residual functional capacity assessment from a treating or examining physician in determining Plaintiff's residual functional capacity, and by failing to include all of her severe impairments in his determination?**

Plaintiff contends that in determining her RFC, the ALJ erred by failing to obtain an RFC assessment from "a treating physician or examining physician," and instead relying upon the findings of Dr. Nayeem and a State Agency physician. In determining Plaintiff's RFC, the ALJ stated as follows:

> . . . . In [evaluating the claimant's residual functional capacity], I have considered the revised criteria for residual functional capacity assessment . . . . In addition, I have considered the claimant's subjective complaints, including those regarding pain . . . Medical opinions as to the claimant's work capacity, including those of Disability Determination Services (DDS) consultants, have been evaluated . . . .

(Tr. 19).

It is the task of the ALJ to determine a claimant's RFC. See, e.g, Phillips v. Barnhart, 357 F.3d 1232, 1238-1239 (11th Cir. 2004). RFC is what the claimant is still able to do despite her impairments, and is based on all relevant medical and other evidence. 20 C.F.R. § 404.1545. An RFC can contain both exertional and nonexertional limitations.

Phillips, 357 F.3d at 1242-1243.  These limitations include a restriction to a particular physical exertion level (sedentary, light, medium or heavy) and a particular skill level (unskilled, semi-skilled or skilled). 20 C.F.R. §§ 404.1567, 404.1568.  Each level is defined by regulation. Id.  The RFC determination is used both to determine whether the claimant: 1) can return to her PRW under the fourth step; and 2) can adjust to other work under the fifth step.  Id.  Thus, in determining whether Plaintiff can return to her PRW, the ALJ must determine her RFC using all relevant medical and other evidence in the case.  20 C.F.R. § 404.1545.  That is, the ALJ must determine if she is limited to a particular work level.  20 C.F.R. §§ 404.1567, 404.1568.  Once the ALJ assesses Plaintiff's RFC, if it is determined that she cannot return to her PRW, the ALJ moves on to the fifth step to determine if there are other jobs in the economy that she can perform.

In this case, Plaintiff argues that the ALJ's RFC determination is flawed because he failed to obtain an RFC assessment from "a treating or examining physician."[6]  Contrary to Plaintiff's claim, however, the ALJ did rely on the functional findings of an examining physician, namely, Dr. Nayeem, in determining her RFC.  (Tr. 15-16, 19, 21-23).  While Plaintiff claims that Dr. Nayeem's findings – that she cannot perform strenuous physical activity or heavy manual labor – are "vague and insufficient" because he failed to identify her abilities on a function-by-function basis, and failed to address her severe impairment of tendonitis/bursitis

_____

[6]For the reasons discussed infra, Plaintiff's additional claim that the ALJ failed to include all of her severe impairments in his RFC determination – because he relied on Dr. Nayeem's functional assessment which she argues failed to include her severe impairment of shoulder bursitis/tendonitis – also lacks merit, because Dr. Nayeem did examine her shoulder and complaints with regard to same.

of the left shoulder, the record reveals that Dr. Nayeem conducted a proper examination and made appropriate findings. For instance, Dr. Nayeem specifically recognized Plaintiff's left arm complaints and assessed her upper extremities during his exam, as well as assessed her functionality, by noting the following:

- she complained of pain in both arms particularly near the shoulder area;

- she reported being able to lift up to 20 pounds;

- she has full forward bending of her back;

- the examination of her upper extremities revealed normal peripheral pulses, normal skin with no vascular changes, normal muscle tone with no wasting, intact sensation to pain, touch and temperature, normal and symmetric dep tendon reflexes, normal muscle coordination, normal joint inspection, normal palpitation and a normal range of motion in her shoulders, elbows, wrists and fingers;

- she had DJD and DDD of her lower back, asymptomatic at the present time with back movements normal; and

- she can take part in mild to moderate activities.

See supra. Thus, Dr. Nayeem did assess Plaintiff's functional abilities although he did not complete a formal RFC assessment. Additionally, Plaintiff has failed to point to any requirement in the Eleventh Circuit or in Social Security Regulations, that requires an ALJ to obtain a formal RFC assessment from either a treating or examining physician in order to render an RFC determination. See, e.g., Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) (providing that it is the claimant's responsibility to provide evidence in support of her claim); 20 C.F.R. §§ 404.1545, 404.1512, 404.1545(a)(3) (same).

Moreover, it is noteworthy that in addition to Dr. Nayeem's functional assessment, the ALJ also relied upon the September 12, 2003 findings of a State Agency physician, as contained in a Residual Physical

14

Functional Capacity Assessment, to determine Plaintiff's RFC.  See supra.
Specifically, a State Agency medical consultant (Identified by Code number
"19") completed a Residual Physical Functional Capacity Assessment –
assessing Plaintiff's diagnoses of exogenous obesity and diabetes and DJD
in the lower back and left foot (after reviewing both Drs. Dozier and
Nayeem's findings) – in which it was concluded that: she can occasionally
lift/carry up to 50 pounds; can frequently lift/carry up to 25 pounds; can
stand/walk/sit for 6 hours per 8 hour workday; has unlimited push/pull
abilities; can frequently climb ramps, stairs, ladders, ropes and
scaffolds, as well as balance, stoop and crawl; can occasionally kneel and
crouch; and has no manipulative, visual, communicative or environmental
limitations.  (Tr. 168-175).  Plaintiff, however, disputes the validity
of this formal RFC assessment on the grounds that it is an RFC from a non-
examining, reviewing medical consultant, whose signature is illegible and
whose credentials are not contained in the record.   Notwithstanding
Plaintiff's claim, the opinions of State Agency physicians are expert
opinions which the ALJ must consider.  20 C.F.R. § 416.927(f)(2)(i); SSR
96-6p.   See also Richardson v. Perales, 402 U.S. 389, 408 (1971).
Furthermore, Plaintiff's suggestion, that the individual who completed the
RFC assessment was not a physician due to the inability to read the
signature, is without merit.  The physician was identified by Code Number
"19," a medical speciality code which signifies a speciality in internal
medicine.[7]  Accordingly, it can be reasonably inferred that the individual
who completed the RFC not only holds a medical degree, but has a

_____

[7]Pursuant to the Social Security Administration website, which provides
public access to the Program Operation Manual System ("POMS"), Identification
Code Number 19 is the Medical Specialty Code for "Internal Medicine."  See,
e.g., https://s044a90.ssa.gov/apps10/poms.nsf/lnx/0426510090!opendocument
(last visited February 12, 2007).  See also POMS Section DI26510.090.

speciality in internal medicine.

**B.**    **Whether the ALJ erred by failing to include all severe impairments in the hypothetical posed to the vocational expert**?

Plaintiff contends that the ALJ failed to include all of her severe impairments in the hypothetical question posed to the vocational expert ("VE") because the hypothetical posed, was based upon Dr. Nayeem's functional assessment which did not address her tendonitis/bursitis. This case was decided at the fourth step of the sequential evaluation process. At this step, the ALJ assesses the claimant's RFC[8] and measures whether she can perform her PRW despite her impairments. See, e.g., Wilson v. Barnhart, 284 F.3d 1219, 1227 (11th Cir. 2002); 20 C.F.R. § 404.1520(f); SSR 82-61. To the extent the ALJ determines at step four that a claimant can return to her PRW, the inquiry ends. See, e.g., Wilson, 284 F.3d at 1227. Indeed, the "testimony of a vocational expert is only required to determine whether the claimant's residual functional capacity permits [her] to do other work after the claimant has met [her] initial burden of showing that [she] cannot do past work." Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987) (citing Chester v. Brown, 792 F.2d 129, 132 (11th Cir. 1986)). See also Lamb v. Bowen, 847 F.2d 698, 703-704 (11th Cir. 1988). Accordingly, in the case at hand, once the ALJ determined that Plaintiff could perform her PRW as a cashier, the sequential evaluation process terminated. As a result, VE testimony was not required, such that any error on the part of the ALJ in failing to include all of Plaintiff's severe impairments in a hypothetical question, is harmless. See, e.g.,

---

[8]As noted infra, RFC is an assessment rendered by the ALJ and which is based upon all of the relevant evidence of a claimant's remaining ability to do work despite her impairments. See, e.g., Beech v. Apfel, 100 F. Supp. 2d 1323, 1330 (S.D. Ala. 2000); 20 C.F.R. §§ 404.1545(a), 1546.

French v. Massanari, 152 F. Supp. 2d 1329, 1338-1339 (M.D. Fla. 2001).

**C.**     **Whether the ALJ erred by failing to consider the impact of her obesity?**

Plaintiff contends that even though the ALJ found her obesity to be a severe impairment, he failed to properly assess whether it impacts her alleged impairments and abilities to perform work-related functions under SSR 02-1p because he ignored Dr. Nayeem's findings and based his decision on what she would be capable of doing if she lost weight, rather than what she is capable of doing at her present weight.  In support of same, Plaintiff references: 1) Dr. Nayeem's diagnosis of exogenous obesity as well as his findings that weight loss would get her diabetes under good control and keep her arthritis from worsening, and that with a proper amount of weight loss, she can be fully functional; and 2) the fact that her BMI range is 36 to 39 (Level II obesity).  (Tr. 21, 167).

Social Security Regulation ("SSR") 02-1p provides that an ALJ must explain how conclusions regarding a claimant's obesity are reached.  SSR 02-1p, 2000 WL 628049, *6 (S.S.A).  The regulation requires the ALJ to consider the effects of obesity at steps three and four when combined with other impairments.  Id.  Section 1.00Q of the Listing of Impairments provides that when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps, including when assessing an individual's RFC, adjudicators must consider any additional and cumulative effects of obesity.[9]  20 C.F.R., Pt. 404, Subpt. P, App. 1; 20 C.F.R. § 404.1523.

---

[9]Listing 1.00Q, regarding obesity, provides as follows:

Effects of obesity. Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal, respiratory or cardiovascular system, and disturbance of this system can be a major cause of disability in individuals with obesity. The

SSR 02-1p also provides that an ALJ must determine whether obesity prevents an individual from working in the national economy at step five. Id.; SSR 02-1p, 2000 WL 628049.

In his decision, the ALJ specifically noted that Plaintiff was obese, found that her obesity was a severe impairment, assigned substantial weight to Dr. Nayeem's findings regarding her limitations, and properly considered her limitations in light of same.  The undersigned's review of the record reveals further, that while Plaintiff has been diagnsosed as obese since 1997, the majority of her physical examinations have resulted in normal findings, and the most that any physician has recommended is for her to follow a 1,500 calorie low fat diet and to lose weight.  See supra.  At Dr. Nayeem's August 15, 2003 physical examination, Plaintiff was found to be 5'8" and weighed 252 pounds.  (Tr. 164-167). Dr. Nayeem diagnosed her with gross obesity exogenous.  (Id.) Plaintiff's physical examination, however, revealed normal upper extremities, normal lower extremities, a walk with a normal gait, negative straight leg raising test at 80 degree lying down and 60 degrees sitting, full forward bending of the back, no atrophy and normal muscle strength; indeed, the only obesity-related problems included a finding of adult onset IDDM under poor control possibly due to excessive eating and no diet and that she could not perform heel/toe walking or fully squat due to extreme obesity,

---

combined effects of obesity with musculoskeletal, respiratory or cardiovascular impairments can be greater than the effects of each of the impairments considered separately.  Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R. Pt. 404, Subpt P. App. 1, Listing 1.00Q.

even though she could climb on/off the examination table normally and dress/undress normally. (<u>Id</u>.)  Dr. Nayeem opined that Plaintiff needed to lose weight in order to get her diabetes under control and to prevent her arthritis from worsening, adding that with a proper amount of weight loss, she could be fully functional. (<u>Id</u>.)  Dr. Nayeem further opined that Plaintiff can presently take part in mild to moderate activities and that she cannot perform strenuous physical activity or heavy manual labor, due to extreme obesity. (<u>Id</u>.)

In his decision, the ALJ relied upon Dr. Nayeem's functional assessment of Plaintiff. (<u>Id</u>. at 15-17, 19-23).  In so doing, the ALJ noted that weight loss would improve her status to be "fully functional;" however, he did <u>not</u> render his conclusions – as Plaintiff contends – based upon what she would be capable of doing if she lost weight or weighed less. (Tr. 15-17, 19-23).  Rather, the ALJ determined his functional assessment based on her weight, or obese status, as it existed. (<u>Id</u>.) In sum, rather than "dismiss" her obesity as Plaintiff alleges, the ALJ's decision clearly reveals that in accordance with SSR 02-1p, he fully analyzed her obesity with regard to all of her impairments and sufficiently articulated his assessment of the relevant evidence – <u>including assigning substantial weight to Dr. Nayeem's functional assessment</u> – such that this Court can trace the path of his reasoning as it relates to that issue. (<u>Id</u>. at 15-17, 19-23).  Thus, the ALJ properly evaluated Plaintiff's obesity.

**D.** **Whether the ALJ erred by finding that Plaintiff does not meet Listing 12.05C?**

Plaintiff asserts that the ALJ erred at step three of the sequential evaluation process by failing to find that she is disabled under Listing

12.05C, based upon Dr. Blanton's April 29, 2004 findings and because the ALJ improperly discounted her testimony.  Plaintiff contends that she meets the first prong of the Listing based on Dr. Blanton's findings of a full IQ score of 66 and adaptive deficits in academic, work, health and self-care, and that she meets the second prong of the Listing due to her diabetes, obesity, tendonitis/bursitis and arthritis.

Listing 12.05C falls under § 12.00 MENTAL DISORDERS and provides as follows regarding mental retardation:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.  The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied ···· C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.[10]  A claimant meets the criteria for presumptive disability under Listing 12.05(c) when the claimant presents a valid IQ score of 60-70,[11] an onset of impairment

---

[10]See also Cobb v. Barnhart, 296 F. Supp. 2d 1295 (N.D. Ala. 2003); Davis v. Shalala, 985 F.2d 528 (11th Cir. 1993)(quoting Listing 12.05C).

[11]A claimant need not present evidence that she manifested deficits in adaptive functioning prior to the age of twenty-two, when she presents evidence of low IQ test results after the age of twenty-two.  Hodges v. Barnhart, 276 F.3d 1265, 1268-1269 (11th Cir. 2001).  Indeed, absent evidence of sudden trauma that can cause retardation, the IQ scores create a rebuttable presumption of a fairly constant IQ through the claimant's life.  Id.  However, the Eleventh Circuit has held that a valid IQ score is not conclusive of mental retardation if the score is "inconsistent with other evidence in the record on the claimant's daily activities and behavior." Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992); Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986).  For instance, in Popp, the plaintiff had a two year college associate's degree and was enrolled in his third year of college as a history major.  Id. at 1498.  He had previously taught algebra at a private school.  Id.  In that case, the Eleventh Circuit held that the listings for mental retardation did not require the Commissioner to make a finding of mental retardation based upon the results of an IQ test alone.  Id. at 1499-1500.  However, the test results must be considered in conjunction with other medical evidence including the daily activities and behavior of the claimant.  Id.

before age 22 _and_ evidence of an additional and significant mental or physical impairment (_i.e._, having more than "minimal effect" on the claimant's ability to perform basic work activities). See, _e.g._, Edwards by Edwards v. Heckler, 755 F.2d 1513, 1516 (11th Cir. 1985).[12]  Claimant bears this burden.  Id.

In his decision, the ALJ concluded that Plaintiff was only mildly limited in her activities of daily living, social functioning, ability to maintain concentration, persistence or pace, and that she had no documented episodes of decompensation. (Tr. 8-24). Specifically, the ALJ addressed Listing 12.05C for Mental Retardation and Dr. Blanton's findings as follows:

> Under the third step, I must determine whether these impairments meet or equal in severity any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. No treating or examining source or medical expert has so concluded. In addition, I have examined the record, and I find that the evidence does not support such a conclusion. **In particular, I have considered listings in 12.05 for mental retardation. Recent IQ scores of 69 and 66 would meet one criteria of these listings, and there is a diagnosis by Dr. Blanton of mental retardation. However, I reject such diagnosis and find that the claimant is not mentally retarded because of her higher adaptive functioning**. These listings, as well as the criteria for mental retardation set forth in _Diagnostic and Statistical Manual of Mental Disorders_, require limitations in adaptive functioning initially manifested during the developmental period. [ ]
>
> **In the present case, I find that the claimant has functioned during her lifetime in an age-appropriate manner** . . . .
>
>          * * *
>
> **I give little weight to Dr. Blanton's opinion regarding claimant's mental functional abilities** . . . . **First, this was a one-time evaluation which relies heavily upon the reports and**

---

[12]See, _e.g._, Wilkinson on behalf of Wilkinson v. Bowen, 847 F.2d 660, 662 (11th Cir. 1987); Barron v. Sullivan, 924 F.2d 227, 229 (11th Cir. 1991); Berryman v. Massanari, 170 F. Supp. 2d 1180, 1186-1187 (N.D. Ala. 2001); Cobb, 296 F. Supp. at 1296-1297.

**subjective allegations of the claimant**.

\* \* \*

**Second, his opinions are inconsistent with his own evaluation and the record as a whole**.  For example, Dr. Blanton assessed a global assessment of functioning score of 50, which, according to the *Diagnostic and Statistical Manual of Mental Disorders*, represents serious impairment in social, occupational or school functioning.  And yet, in his Medical Source Opinion form, he indicated that the claimant has only "mild" impairment in her ability to understand, remember and carry out simple instructions, "mild" impairment in her social functioning within a work setting, "mild" activities of daily living, "mild" deterioration in personal habits, and "mild" constriction of interests.  While he indicated that she has marked limitation in concentration, persistence and pace, he performed no cognitive and sensorium testing . . . during the mental status exam to confirm this.  On the other hand, the claimant demonstrated the ability to complete several formal tests during the evaluation without distraction.  Dr. Blanton also opined that the claimant has marked limitation in her ability to respond to customary work pressures, but the record is absent any episodes of decompensation at home or in the work place . . . .

(Tr. 18-19) (footnote and citations omitted) (emphasis added).

As noted _supra_, a claimant meets the criteria for presumptive disability under Listing 12.05(c) when she satisfies two prongs: 1) a valid IQ score of 60-70 and onset of impairment before age 22; and 2) evidence of an additional and significant mental or physical impairment (_i.e._, having more than "minimal effect" on the claimant's ability to perform basic work activities).  See, _e.g._, _Edwards_, 755 F.2d at 1516.  Regarding the first prong of Listing 12.05C, Plaintiff has presented evidence of a low IQ scores which the ALJ accepted as valid; however, such scores, standing alone, are insufficient to prove that she meets Listing 12.05C, particularly given the ALJ's finding of an absence of deficits in adaptive behavior and that her scores were inconsistent with other evidence of record.  See _supra_.

Case law provides that a claimant need not present evidence that she

manifested deficits in adaptive functioning prior to the age of twenty-two, when she presents evidence of low IQ test results *after* the age of twenty-two. <u>Hodges v. Barnhart</u>, 276 F.3d 1265 (11th Cir. 2001). Absent evidence of sudden trauma that can cause retardation, the IQ scores create a rebuttable presumption of a fairly constant IQ through the claimant's life. <u>Id</u> at 1268-1269. However, the Eleventh Circuit has held that a valid IQ score is not conclusive of mental retardation if the score is "inconsistent with other evidence in the record on the claimant's daily activities and behavior." <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837 (11th Cir. 1992); <u>Popp v. Heckler</u>, 779 F.2d 1497, 1499 (11th Cir. 1986).

In this case, the record reflects that based on his April 29, 2004 evaluation of Plaintiff, Dr. Blanton concluded that her mental retardation was "obvious" due to her full scale IQ score of 66 and achievement test scores at the 5th grade level; as such, he diagnosed her with mild mental retardation and assigned a GAF score of 50 (indicating serious symptoms or any serious impairment in social, occupational or school functioning). (Tr. 179-182). Dr. Blanton also completed a Medical Source Opinion in which he found that Plaintiff has mild limitations in her abilities to maintain activities of daily living, understand, remember and carry out simple instructions, respond appropriately to supervision and co-workers, deal with changes in a routine work setting, respond appropriately to customers or other members of the general public, and use judgment in simple one or two step work-related decisions; and marked limitations in her abilities to understand, remember and carry out detailed or complex instructions, respond to customary work pressures, use judgment in detailed or complex work-related decisions, and maintain attention, concentration or pace for periods of at least two hours. (<u>Id</u>. at 183-

184).  It was also noted that she had a mild degree of deterioration in personal habits and a mild degree of constriction of interests.  (Id. at 184).  Dr. Blanton opined that these limitations would last for 12 months or longer and have existed at their severity levels for 1 year, that her pain allegations are consistent with clinical findings, and that her condition is likely to deteriorate if placed under stress, especially that of a job; however, he found that she can manage benefits in her best interests.  (Id. at 184).  Dr. Blanton stated also, that "[r]ehabilitation will be very difficult due to the combination of MR, poor academic skills, physical and emotional problems."  (Id.)

In his decision, the ALJ rejected Dr. Blanton's findings, stating that while Plaintiff had low IQ scores, she achieved adaptive functioning above the level required for such a diagnosis, due, in part, to the following: 1) she testified that she was not placed in special education classes; 2) while unmarried, she raised seven children without the assistance of a spouse; 3) she takes care of her personal needs, health problems, makes doctors appointments, monitors her blood sugar daily and injects insulin on a daily basis; 4) she took and passed a written driver's test on the first attempt; and 5) she worked for 8 years as a cashier; and 6) she filed for, and received, unemployment benefits.  (Tr. 18-19, 22).  In sum, the ALJ determined that while Dr. Blanton's IQ scores for Plaintiff were valid, the scores were not conclusive of mental retardation, and his diagnosis of such was due to be rejected because the scores and diagnosis were inconsistent with other evidence of record regarding her daily activities and behavior.[13]  (Id.)

_____

[13]See, e.g., Lowery, 979 F.2d at 837 (finding that a valid IQ test score is not conclusive of mental retardation if the score is inconsistent with other evidence of record as to a claimant daily's activities and behavior);

The undersigned's review of the record reveals that substantial evidence of record supports the ALJ's decision.  At the outset, Plaintiff did not allege mental retardation as a disabling condition in her benefits application, did not testify as to any mental retardation at the administrative hearing, and did not stop working due to any alleged inability to perform the mental requirements of her semi-skilled job as a cashier.  See supra.  Additionally, a review of Plaintiff's daily activities and behavior undermine the validity of her mental impairment claim.  Id.  Plaintiff attended regular education classes through the 10th grade, was married twice, raised a large family of seven children, worked for 8 years at the semi-skilled job of cashier, has a driver's license and can drive, attends church, watches television, visits with friends, obtained unemployment benefits, and is able to take care of her personal needs.[14]  Id.  Moreover, Plaintiff has failed to present any evidence of record showing any deficits in adaptive behavior before age 22.  Further, Dr. Blanton's one-time mental examination and resulting mental retardation diagnosis were properly rejected by the ALJ not only because he relied heavily upon Plaintiff's subjective complaints, but also because his evaluation is internally inconsistent (e.g., while stating that Plaintiff did not drive thus suggesting she could not, he failed to acknowledge that she had taken and passed a written driver's license test, and while he

---

Popp, 779 F.2d at 1499-1500 (holding that an IQ test score alone does not establish a finding of mental retardation as the ALJ is to evaluate the IQ score in conjunction with the medical report and test results to ensure that they correspond with daily activities and behavior).

[14]While the undersigned notes Plaintiff's argument that her uncontrolled diabetes translates into an inability to adequately take care of her health needs – and thus mental retardation meeting Listing 12.05C – she has presented no evidence to support this link, and moreover, the ALJ found this to be due, at least in part, to medical noncompliance.

found she only had "mild" impairments in social functioning, activities of daily living, personal habit deterioration, constriction of interests and in her abilities to understand, remember and carry out simple instructions, he inexplicably assigned her a GAF of 50 indicating that she was seriously impaired).

As such, Plaintiff's low IQ scores are not conclusive of mental retardation. See, e.g., Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992); Popp v. Heckler, 779 F.2d 1497, 1499-1500 (11th Cir. 1986); Sellers v. Barnhart, 246 F. Supp. 2d 1201, 1206 (M.D. Ala. 2002); House v. Apfel, 2000 WL 1368012, *8 (S.D. Ala. Sept. 6, 2000). Accordingly, substantial evidence supports the ALJ's finding that Plaintiff did not meet the first prong of Listing 12.05C. Id. Thus, because Plaintiff did not meet the first prong of Listing 12.05C, it was not necessary for the ALJ to determine whether she met the second prong.

**V.   Conclusion**

For the reasons set forth, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **RECOMMENDED** that the decision of the Commissioner of Social Security, denying Plaintiff's claim for disability insurance benefits and supplemental security income, be **AFFIRMED.**

The attached sheet contains important information regarding objections to this Report and Recommendation.

**DONE** this **12th** day of **February, 2007.**

        /s/SONJA F. BIVINS
**UNITED STATES MAGISTRATE JUDGE**

### MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
### AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
### AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1.   **Objection**.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  See 28 U.S.C. § 636(b)(1)(c); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection. The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

> A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   **Opposing party's response to the objection.**  Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection.  Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.   **Transcript (applicable where proceedings tape recorded)**.  Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

> /s/SONJA F. BIVINS
> **UNITED STATES MAGISTRATE JUDGE**